**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| DETEGO HEALTH, LLC, a Texas Limited Liability Company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. |
| THE ENGINEERED INNOVATION GROUP, INC, a Delaware Corporation, JAKE MILLER, and ERIC TOBIAS, | ) ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES the Plaintiff, DETEGO HEALTH, LLC., a Texas Limited Liability Company, by and through its attorneys, PETERSON, JOHNSON & MURRAY, LLC, and for its Complaint at Law against THE ENGINEERED INNOVATION GROUP, INC. ("EIG"), a Delaware Corporation, states as follows:

## PARTIES

1. At all times relevant hereto, Plaintiff, DETEGO HEALTH, LLC, was a Limited Liability Corporation, organized and existing under the laws of the State of Texas, with its principal place of business located in Fort Worth, Texas, and acting as a national Third Party Administrator offering healthcare benefits plan administration, reporting services, performance analysis, benefits design, and management.

2. At all times relevant hereto, Defendant, EIG, was a Limited Liability Corporation, organized and existing under the laws of the State of Indiana, with its principal office located in Indianapolis, Indiana, and offering artificial intelligence driven capabilities that enable its clients to transform their businesses through its flagship platform Roxie AI.

1

3. At all times relevant hereto, Defendant, JAKE MILLER, was the CEO of Defendant, EIG, and resides in Indiana.

4. At all times relevant hereto, Defendant, ERIC TOBIAS, was the Chairman of the Board of Defendant, EIG, and resides in Indiana.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. This Court has personal jurisdiction over EIG, because it is a Delaware Corporation with its principal office address located in Indianapolis, Indiana.

7. This Court has personal jurisdiction over Jake Miller because he resides in Indiana.

8. This Court has personal jurisdiction over Eric Tobias because he resides in Indiana.

9. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391, as Defendants reside in Indiana, and the Southern District of Indiana encompasses the location where Defendants reside.

## STATEMENT OF FACTS

10. On or about January 28, 2024, Plaintiff and EIG entered into a written contract that was titled "Master Services Agreement". ("the MSA") to govern the provision of services by EIG to Detego. (See Exhibit "A" attached hereto and incorporated herein).

11. Under the terms of the MSA, EIG agreed, in return for compensation, "to perform certain services as may be requested" by Plaintiff and agreed by EIG "in one or more Statements of Work ("SOW")" agreed by the parties.

12. These services included, but were not limited to, the development of innovations, processes, and intellectual property for the benefit of Plaintiff.

13. The MSA explicitly established that all intellectual property developed by EIG within the scope of its work for Plaintiff would be the sole and exclusive property of Plaintiff.

14. EIG agreed that it assigned to Plaintiff, or Plaintiff's designee, EIG entire worldwide right, title and interest in and to all Plaintiff's Innovations and all associated records and intellectual property rights. (Ex. A, ¶ 4.1(b)).

15. EIG also agreed that it will not accept work, enter into a contract, or accept an obligation, inconsistent or incompatible with EIG's obligations, or scope or services rendered for Plaintiff, under the MSA. (Ex. A, ¶ 5).

16. The MSA also contained robust confidentiality provisions that defined "Confidential Information" broadly to include technical and non-technical information, trade secrets, intellectual property, and other proprietary information related to the Plaintiff's business. (Ex. A, ¶ 4.2(a)).

17. EIG was obligated to maintain the confidentiality of such information and to use it solely for the purpose of performing services for Plaintiff. (Ex. A, ¶ 4.2(b)).

18. The MSA also included a "No Conflict of Interest" clause which prohibited Defendants from engaging in any work or obligations that would conflict with its duties under the MSA. This provision was designed to ensure that EIG's actions would not undermine Plaintiff's business interests. (Ex. A, ¶ 5).

19. In accordance with the terms of the MSA, Plaintiff provided EIG with access to confidential information that included protected intellectual property, trade secrets, proprietary

information, customer and client lists, processes, algorithms, and software programs related to its business. (Ex. B Declaration of Richard Haldeman, ¶ 16).

20. According to the MSA, EIG shall not use or disclose confidential information of the other party without prior written consent other than for the benefit of Plaintiff. (Ex. A, ¶ 4.2(b)).

21. On March 16, 2025, Plaintiff and EIG agreed to a Statement of Work titled "Detego Health Salesforce Replatform & Roxie AI Implementation" ("SOW") wherein EIG agreed to upgrade Plaintiff's existing Salesforce platform by implementing EIG's Roxie AI automation solution to reduce Plaintiff's reliance on manual workflows, thereby permitting Plaintiff to accelerate claims processing, cut call center wait times, and improve auto-adjudication of claims. ("the Project"). (See Exhibit "C" attached hereto and incorporated herein).

22. The SOW identified a Team Allocation and Hourly Billing Structure appointing project leaders who would collaborate closely with additional team members hired or resourced by Plaintiff to complete the Project.

23. The SOW also specified a budget and billing structure divided into phases and extending over a period of six (6) months and setting Payment Terms for the SOW.

24. Subsequently to the execution of the SOW, Defendants alerted Plaintiff that EIG was experiencing certain financial difficulties that threatened EIG's ability to not only complete the Project but also continue to remain in business as a viable company.

25. Specifically, Jake Miller informed Plaintiff that EIG was unable to meet its payroll obligations in order to properly staff its Roxie AI system that was essential to the services outlined in the SOW. (Ex. B, ¶ 20).

26. Plaintiff and Defendants then into an agreement wherein Plaintiff would pay Defendants' payroll for the period covered by the SOW. (Ex. B, ¶ 21).

4

27. In exchange for Plaintiff paying Defendants' payroll, EIG and Jake Miller agreed that EIG would separate Roxie AI from EIG so that it would become part of a new company that would be subsumed into Plaintiff's business operations. (Ex. B, ¶ 22).

28. In accordance with this agreement, Detego paid EIG $170,000.00 so that it could meet its payroll obligations. (Ex. B, ¶ 23).

29. Subsequent to the agreements entered into by the parties described above, on or about June 16, 2025, Alan Wilson, the President and Chief Legal Officer of Detego Health, LLC, and Richard Haldeman, the Chief Executive Officer of Detego Health, LLC had a conversation with Jake Miller, wherein they were advised that EIG agreed to terms to sell EIG to TrueTech, an India-based company. (Ex. B, ¶ 24).

30. Thereafter, on June 26, 2025, Detego received correspondence from Bose, McKinney & Evans, LLP, attorneys for EIG. The letter advised that "due to recent and significant financial challenges, EIG has determined that it is necessary to cease its business operations, effective as of Monday, June 30, 2025." (See Exhibit "D" attached hereto and incorporated herein).

31. The letter further stated that "EIG recommends that Detego consider engaging TrueTech Solutions ("TrueTech"), under the leadership of Naren Vijayakumar, to assist with transition support and the maintenance of existing platforms. EIG is willing to facilitate an introduction, and TrueTech has conveyed a willingness to begin onboarding promptly."

32. On June 30, 2025, EIG ceased its business operations.

33. Defendants have refused to share with Plaintiff any proprietary code associated with the Roxie AI platform, despite its inclusion of Plaintiff's confidential information, intellectual property, and other proprietary materials.

Despite their agreement to sever Roxie AI from EIG, Defendants have reached an agreement to separate Roxie AI from EIG and form a new company that is funded by Eric Tobias but will not be subsumed into Detego's business operations.

34. The aforementioned sale and severance of Roxie AI exposes Plaintiff's confidential information and intellectual property to unauthorized third parties.

35. Such exposure breaches the confidentiality provisions of the MSA and results in irreparable harm to Plaintiff.

36. Plaintiff has never provided its consent, either written or otherwise, for the disclosure of its confidential information to any third party.

37. Plaintiff has performed all of its obligations under the SOW.

38. Plaintiff has also performed its obligation under the parties' separate agreement by paying all of Plaintiff's payroll obligations during the period covered by the SOW.

39. Despite Plaintiff's performance, Defendants have refused to fulfill their obligation to sever Roxie AI and allow it to be subsumed in Plaintiff's business operations.

40. EIG has failed to deliver and/or develop, among others, the following deliverables promised under the Agreement: AI-Driven Claims Adjudication & Process Automation; deployment of Roxie AI to automate claims adjudication, document indexing, and duplicate claim detection; implementation of intelligent queue prioritization based on complexity, urgency, and claim type; integration of policy-driven decision0making for auto-adjudication rules and real-time claim status tracking; automated prior authorization workflows to reduce processing delays and manual effort; customer service automation via Roxy AI for real-time status inquiries, claim tracking, and provider communications; multi-channel support (chat, email, SMS, mobile push notifications) for members and providers; deployment of a self-service portal and mobile

application features to allow members to check claim status, submit documents, and receive automated updates; implementation of a secure provider web form for document submissions and case tracking; Development of a real-time COB verification system leveraging member input and external eligibility data sources; Optional integration with third-party verification services (e.g., Experian Health) for automated coverage discovery; design and implement intelligent work distribution and queue management to balance workloads dynamically; role-based workload prioritization and assignment models for adjudicators, customer service agents, and claims processors; and automated real-time reporting and dashboards to track claim processing efficiency, customer service performance, and error reduction.

41. On June 30, 2025, EIG ceased its business operations and did not perform its contractual obligations to the Plaintiff.

**CLAIMS FOR RELIEF**

**Count I – Breach of Contract**

36. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

37. Plaintiff and Defendants entered into a valid and enforceable agreement.

38. Under this agreement, Plaintiff agreed to pay Defendants' payroll, and Defendants agreed to allow Detego Health to subsume the AI-assets inside a new company called Roxie AI, which Jake Miller would hold a minority interest.

39. Plaintiff performed its obligations under the agreement by paying EIG's payroll.

40. Plaintiff paid $170,000.00 to fulfill Defendants' payroll obligations.

41. Plaintiff also made the following payments to Defendants in accordance with the March 16, 2025 SOW:

- $102,750.00 on March 17, 2025;
- $12,000.00 on April 2, 2025;
- $77,062.50 on April 4, 2025;
- $77,062.50 on May 12, 2025;
- $77,062.50 on June 11, 2025.

42. Defendants breached their agreement with Plaintiff by refusing to transfer Roxie AI to Plaintiff.

43. Despite Plaintiff's repeated requests, Defendants have failed and refused to transfer Roxie AI as agreed.

44. Defendants have failed to perform their contractual obligations to the Plaintiff.

45. EIG has not performed its contractual obligations to the Plaintiff as specified in the MSA.

46. EIG has not performed its contractual obligations to the Plaintiff as specified in the SOW.

47. Defendants have disclosed Plaintiff's confidential proprietary information to a third party without Plaintiff's consent.

48. As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages.

49. Plaintiff has been deprived of the value and benefits of Roxie AI, which was the consideration for plaintiff's payment of Defendants' payroll.

50. Plaintiff has been deprived of the benefits that were to be provided by the Plaintiff as agreed in the MSA.

51. Plaintiff has suffered damages in that its confidential proprietary information has been disclosed to a third party without its consent and solely for the Defendants' benefit.

### Count II - Promissory Estoppel

52. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

53. Defendants made an unambiguous promise to Plaintiff.

54. Defendants promised that if Plaintiff paid Defendant's payroll and assume all existing payroll liabilities, then Defendants would sever Roxie AI and transfer its assets to a new company Jake Miller holding a minority stake.

55. Defendants also promised that this new company would be subsumed in Plaintiff's business.

56. Plaintiff reasonably and foreseeably relied on Defendants' promise.

57. In reliance on Defendant's promise, Plaintiff paid Defendants' payroll obligations.

58. Plaintiff's reliance was to its detriment.

59. Plaintiff expended significant funds to pay Defendants' payroll, which it would not have done absent Defendants' promise to sever the Roxie AI system and transfer its assets to Plaintiff's business. .

60. Injustice can only be avoided by enforcing Defendants' promise.

61. Defendants have been unjustly enriched by receiving the benefit of having their payroll paid while refusing to provide the promised consideration.

### Count III - Unjust Enrichment

62. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

63. Defendants received a benefit from plaintiff.

64. Defendants received the benefit of having their payroll obligations paid by Plaintiff.

65. On February 28, 2025, Plaintiff paid Defendant $75,000.00 to fulfill Defendants' payroll obligations.

66. On May 24, 2025, Plaintiff paid $95,000.00 to fulfill Defendants' payroll obligations.

67. Plaintiff paid a total of $170,000.00 to fulfill Defendants' payroll obligations.

68. The benefit was received to Plaintiff's detriment.

69. Defendants have retained the benefit of having their payroll paid while refusing to provide the agreed-upon consideration of severing Roxie AI and transferring its assets to Plaintiff's business.

70. Under the circumstances, it would be unjust for Defendants to retain the benefit without compensating Plaintiff.

## Count IV - Specific Performance

71. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

72. Plaintiff and Defendants entered into a valid contract with clear and unambiguous terms.

73. The parties agreed that in exchange for Plaintiff paying Defendants' payroll, Defendants would sever Roxie AI and transfer its assets to Plaintiff's business.

74. Plaintiff has no adequate remedy at law.

75. Monetary damages are inadequate because Roxie AI is unique and its value cannot be easily quantified.

76. Roxie AI is a "Multi-Agentic AI" that allows users to build multiple cascading agents on a single platform and essential to the vital processes of Plaintiff's business.

77. There is mutuality of obligation between the parties.

78. All parties had clear obligations under the agreement: Plaintiff to pay Defendants' payroll and Defendants to sever Roxie AI and allow it to be subsumed into Plaintiff's business.

79. Enforcement of the agreement is feasible.

80. The court can feasibly order Defendants to transfer Roxie AI to Plaintiff.

**Count V – Indiana Trade Secrets Act**

82. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

83. Plaintiff and Defendants entered into a valid contract with clear and unambiguous terms.

84. Plaintiff possessed trade secrets as defined by the Indiana Trade Secrets Act.

85. Plaintiff's confidential information, including technical and non-technical information, intellectual property, and other proprietary information related to Plaintiff's business, qualifies as "trade secrets" under Burns Ind. Code Ann. § 24-2-3-2 as it derives independent economic value from not being generally known and is subject to reasonable efforts to maintain its secrecy.

86. Plaintiff took reasonable steps to maintain the secrecy of its trade secrets.

87. Plaintiff protected its trade secrets through confidentiality provisions in the MSA, which obligated Defendants to maintain the confidentiality of Plaintiff's information and to use it solely for the purpose of performing services for Plaintiff.

88. Defendants acquired Plaintiff's trade secrets under circumstances giving rise to a duty to maintain their secrecy.

89. Defendants acquired Plaintiff's trade secrets through the parties' contractual relationship, which created a duty for Defendants to maintain the secrecy of Plaintiff's confidential information as explicitly stated in the MSA.

90. Defendants have misappropriated or threatened to misappropriate Plaintiff's trade secrets.

91. Defendants' planned sale of their business, including the Roxie AI system that contains or was developed using Plaintiff's confidential information and intellectual property, to a third party in India without Plaintiff's consent constitutes threatened misappropriation of Plaintiff's trade secrets.

92. Defendants' refusal to sever and transfer the Roxie AI system despite their agreement, and Defendants' plan to cease operations without sharing the proprietary code associated with Roxie AI, further constitutes misappropriation or threatened misappropriation.

93. Plaintiff has suffered and will continue to suffer damages, including the loss of the Roxie AI system that was developed using Plaintiff's confidential information, disruption to Plaintiff's business operations, and potential exposure of Plaintiff's trade secrets to unauthorized third parties.

## COUNT VI
## Application for Preliminary Injunction

94. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

95. Plaintiff seeks entry of a preliminary injunction against Defendants prohibiting them from selling their company or otherwise transferring their assets, including but not limited to its Roxie AI system, pending final resolution of this matter.

97. Entry of an injunction is necessary in order to safeguard Plaintiff's confidential information that included protected intellectual property, trade secrets, proprietary information, customer and client lists, processes, algorithms, and software programs related to its business.

98. Without such relief, Plaintiff's works, business relationships, customer relationships and business interests will be imminently and irreparably harmed by Defendants' conduct and continued tortious and unlawful infringement of Plaintiff's intellectual property rights.

99. Should Defendants be allowed to persist in their unlawful and unauthorized conduct, Plaintiff will be imminently and irreparably harmed because once Plaintiff's data is transferred to TrueTech Solutions in Chennai, India, Plaintiff will not be able to recover its confidential information or be fully compensated for the associated losses.

100. There is a substantial likelihood that Plaintiff will prevail on its claims against Defendants at trial, as Defendants willfully and intentionally misused Plaintiff's confidential information and trade secrets.

101. Further, Defendants have no right to use and promulgate Plaintiff's proprietary information for any purpose not covered by the MSA or SOW. Defendants can show no affirmative right to such information and materials or provide any legal justification for violation of the Trade Secrets Act.

102. There is also a substantial likelihood that Plaintiff will prevail on its claims against Defendants for breach of contract, promissory estoppel, unjust enrichment, and specific performance.

103. Issuance of a preliminary injunction will not adversely affect the public interest, which is better served by protecting Plaintiff and others from unfair and unlawful practice as the result of misappropriation and misuse of its intellectual property.

## COUNT VII
## Application for Mandatory Injunction

104. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

105. Plaintiff seeks entry of a mandatory injunction against Defendants, ordering them to transfer ownership of the Roxie AI system to Plaintiff as previously agreed. Plaintiff and Defendants entered into a valid and enforceable agreement under which Plaintiff agreed to pay Defendants' payroll obligations, and Defendants agreed to sever Roxie AI and transfer their assets to Plaintiff's business.

106. The terms of this agreement were clear and unambiguous, with Plaintiff to pay Defendants' payroll, and Defendants to transfer Roxie AI's assets to Plaintiff.

107. Plaintiff has performed its contractual obligations.

108. Defendants have failed to perform their contractual obligations and transfer ownership of the Roxie AI system to Plaintiff despite Plaintiff's performance under the contract.

109. The Roxie AI system is integral to Plaintiff's business operations in that it would accelerating claims processing, reducing call center wait times, and improve auto-adjudication of claims.

110. The Roxie AI system's unique capabilities cannot be replicated or replaced by other available technologies, making its loss irreparable.

111. Monetary damages are inadequate in this case because Roxie AI is unique, and its value cannot be easily quantified.

112. A mandatory injunction is necessary under these circumstances. Should Defendants be allowed to persist in their unlawful and unauthorized conduct, Plaintiff will be imminently and irreparably harmed because once Plaintiffs' data is transferred to TrueTech Solutions in Chennai, India, on June 30, 2025, Plaintiff will not be able to control the dissemination of their confidential information.

113. Plaintiff will also be imminently and irreparably harmed if it cannot obtain the Roxie AI, as promised under the existing agreement because it can never be fully compensated for the associated losses.

114. There is a substantial likelihood that Plaintiff will prevail on its claims against Defendants at trial, as Defendants willfully and intentionally breached the existing contract.

115. Further, Defendants have no right to use and promulgate Plaintiff's proprietary information, including information relative to Roxie AI system, for any purpose not covered by the MSA or SOW. Defendant can show no affirmative right to such information and materials or provide any legal justification for violation of the Trade Secrets Act.

116. Issuance of a mandatory injunction will not adversely affect the public interest, which is better served by protecting the validity of enforceable contracts and parties involved.

## COUNT VIII
### Application for Permanent Injunction

117. Plaintiff incorporates and re-alleges each and every foregoing paragraph as if fully set forth herein.

Plaintiff asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

A. An order of specific performance requiring Defendants to transfer Roxie AI to Plaintiff in accordance with the parties' agreement;

B. In the alternative, compensatory damages in an amount to be determined at trial, representing the value of Roxie AI and any other losses resulting from Defendants' breach of contract;

C. In the alternative, restitution of all funds paid by Plaintiff for Defendants' payroll;

D. Compensatory damages for Defendants; breach of the Master Services Agreement;

E. Compensatory damages for Defendants' breach of the Statement of Work executed on March 26, 2025;

F. Grant Plaintiff's Applications for Preliminary and Permanent Injunction preventing Defendants from selling their company or otherwise transferring ownership of its assets, particularly the Roxie AI system, until the case is resolved on the merits;

G. Granting Plaintiff's Application for Mandatory Injunction requiring Defendants to transfer ownership of the Roxie AI system to Plaintiff as agreed in the parties' contract;

H. Prejudgment interest;

I. Reasonable attorneys' fees and costs incurred in bringing this action; and

J. Such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

          Respectfully Submitted

          By: **/s/** *Paul O'Grady*
             Attorney for Plaintiff

Paul O'Grady
Jeffrey D. Skly
Adriana U. Noworolnik
Peterson, Johnson & Murray, LLC
1301 W. 22nd Street, Suite 500
Oak Brook, Illinois 6052
T: 312-724-8033
pogrady@pjmlaw.com
jskly@pjmlaw.com
anoworolnik@pjmlaw.com