# EXHIBIT A

DocuSign Envelope ID: B3D8AF38-6C9C-489F-8D57-042C2C9EB4E6

# Master Services Agreement

Engineered Innovation Group

This Master Services Agreement ("Agreement") is made and entered into as of 1/28/2024 ("Effective Date"), by and between Detego Health LLC ("Company"), having a principal place of business at **3000 S. Hulen St.  STE 124 Fort Worth, TX 76109** and **The Engineered Innovation Group, LLC** ("Agency"), having a principal place of business at 55 Monument Circle, Suite 1200B, Indianapolis, IN 46204.

1. <u>Retention of Services</u>.  Company hereby retains Agency to perform certain services and other related services as may be requested by the Company and agreed upon by Agency in one or more Statements of Work ("SOW") which is attached as Exhibit A.

2. <u>Compensation</u>.

    2.1 <u>Fees</u>.  Company will pay Agency fees for services rendered as agreed upon in Exhibit A (Statement of Work). Fees will be invoiced by Agency on a monthly basis or on such other basis as may be agreed to by the parties. All invoices are due net 30 with the exception of the first invoice which is due upon contract execution by both parties.

    2.2 <u>Expenses</u>.  Company shall reimburse Agency for reasonable expenses incurred in connection with the performance of services under this Agreement, provided that the Agency promptly provides documentation satisfactory to Company to support Agency's request for reimbursement. Reimbursement is subject to the Company's Business and Travel Expense Policy. Expenses to be incurred by EIG on behalf of the Company must be pre-approved by the Company.

3. <u>Agency Relationship</u>.  Agency's relationship with Company will be that of an independent agency, and nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship.  Agency will not be entitled to any of the benefits that Company may make available to its employees, including, but not limited to, group health, life insurance, profit-sharing or retirement benefits, paid vacation, holidays or sick leave.  Agency will not be authorized to make any representation, contract or commitment on behalf of Company unless specifically requested or authorized in writing to do so by the Chief Executive Officer of Company.  Agency will be solely responsible for obtaining any business or similar licenses required by any federal, state or local authority.  In addition, Agency will be solely responsible for, and will file on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement.  No part of Agency's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes.

DocuSign Envelope ID: B3D8AF38-6C9C-489F-8D57-042C2C9EB4E6

3.1     Method of Performing Services; Results.  In accordance with Company's objectives, Agency will determine the method, details and means of performing the services required by this Agreement.  Company shall have no right to, and shall not, control the manner or determine the method of performing Agency services.  Agency shall provide the services for which Agency is engaged to the reasonable satisfaction of Company. Company may suggest to Agency, from time to time, methods or strategies Company believes may assist Agency in the performance of Agency's services under this Agreement.  Consistent with Agency's independent agency status, however, Agency shall exercise Agency's independent business discretion in determining whether or not to follow Company's suggestions.

3.2     Workplace, Hours and Instrumentalities.  Agency may perform the services required by this Agreement at any place or location and at such times as Agency shall determine. Agency agrees to provide all tools and instrumentalities, if any, required to perform the services under this Agreement.

4.     Intellectual Property Rights.

4.1     Ownership of Innovations.

(a)     Innovations; Company Innovations.  "Innovations" includes processes, machines, compositions of matter, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectable under trade secret laws), and all other subject matter protectable under patent, copyright, moral right, mask work, trademark, trade secret or other laws, and includes without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, discoveries, artwork, software, and designs.  "Company Innovations" are Innovations that Agency, solely or jointly with others, conceives, reduces to practice, creates, derives, develops or makes within the scope of Agency's work for Company under this Agreement.

(b)     Disclosure and Ownership of Company Innovations.  Agency agrees to make and maintain adequate and current records of all Company Innovations, which records shall be and remain the property of Company.  Agency agrees to promptly disclose to Company every Company Innovation.  Agency hereby does and will assign to Company, or Company's designee, Agency's entire worldwide right, title and interest in and to all Company Innovations and all associated records and intellectual property rights.

(c)     Assistance.  Agency hereby assigns Company Innovations to Company in the form included with this Agreement for each of the Company Innovations, including, but not limited to, computer programs, notes, sketches, drawings and reports. Agency agrees to assist Company in any reasonable manner to obtain, perfect and enforce, for Company's benefit, Company's rights, title and interest in any and all countries, in and to all patents, copyrights, moral rights, mask works, trade secrets, and other property rights in each of

DocuSign Envelope ID: B3D8AF38-6C9C-489F-8D57-042C2C9EB4E6

the Company Innovations. Agency agrees to execute, when requested, for each of the Company Innovations (including derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, or continuing patent applications thereof), (i) patent, copyright, mask work or similar applications related to such Company Innovation, (ii) documentation (including without limitation assignments) to permit Company to obtain, perfect and enforce Company's right, title and interest in and to such Company Innovation, and (iii) any other lawful documents deemed necessary by Company to carry out the purpose of this Agreement. If called upon to render assistance under this paragraph, Agency will be entitled to reimbursement of authorized expenses incurred at the prior written request of Company. In the event that Company is unable for any reason to secure Agency's signature to any document Agency is required to execute under this Paragraph 4.1(c) ("Assistance"), Agency hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Agency's agents and attorneys-in-fact to act for and in Agency's behalf and instead of Agency, to execute such document with the same legal force and effect as if executed by Agency.

(d) <u>Out-of-Scope Innovations</u>. If Agency incorporates any Innovations relating in any way to Company's business or demonstrably anticipated research or development or business which were conceived, reduced to practice, created, derived, developed or made by Agency either outside of the scope of Agency's work for Company under this Agreement or prior to the Effective Date (collectively, the "Out-of-Scope Innovations") into any of the Company Innovations, such Out-of-Scope Innovations are owned by Agency. Agency hereby grants to Company or Company's designees a royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to practice all applicable patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Out-of-Scope Innovations which Agency incorporates, or permits to be incorporated, in any Company Innovations.

4.2 <u>Confidential Information.</u>

(a) <u>Definition of Confidential Information</u>. "Confidential Information" as used in this Agreement shall mean any and all technical and non-technical information including but not limited to patent, copyright, trade secret, and proprietary information, customer and client lists and information, candidate lists and information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, equipment, algorithms, software programs, software source documents, and formulae related to the current, future and proposed products and services of the respective parties, suppliers and customers of the respective parties, and includes, without limitation, Innovations, Company Innovations, Company Property (defined below), and Company's and Agency's information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, business forecasts, sales and merchandising and marketing plans and information.

(b) <u>Nondisclosure and Nonuse Obligations</u>. Except as permitted in this paragraph, neither party shall use or disclose the Confidential Information of the other party without prior written consent; provided, however, that Agency may use Company's Confidential

Information solely to perform services for the benefit of Company.  Each party agrees to treat all Confidential Information of the other party with the same degree of care as the receiving party accords to its own Confidential Information, but in no case less than reasonable care.  Agency agrees that Agency shall disclose Company's Confidential Information only to those of Agency's employees who need to know such information, and Agency certifies that such employees have previously agreed, either as a condition of employment or in order to obtain Company's Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Agency under this Agreement.  Company agrees that Company shall disclose Agency's Confidential Information only to those of Company's employees who need to know such information, and Company certifies that such employees have previously agreed, either as a condition of employment or in order to obtain Agency's Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Company under this Agreement. Each party agrees not to communicate any information to the other party in violation of the proprietary rights of any third party. Each party will immediately give notice to the other party of any unauthorized use or disclosure of the Confidential Information and agrees to assist the disclosing party in remedying any such unauthorized use or disclosure of the Confidential Information.

(c)     <u>Exclusions from Nondisclosure and Nonuse Obligations</u>.  The obligations under Paragraph 4.2(b) ("Nondisclosure and Nonuse Obligations") with respect to any portion of the Confidential Information shall not apply to any such portion which the receiving party can demonstrate:  (a) was in the public domain at or subsequent to the time such portion was communicated to the receiving party through no fault of the receiving party; (b) was rightfully in the receiving party's possession free of any obligation of confidence at or subsequent to the time such portion was communicated to the receiving party by the disclosing party; or (c) was developed by employees of the receiving party independently of and without reference to any information communicated to the receiving party by the disclosing party.  A disclosure of Confidential Information by the receiving party, either:  (a) in response to a valid order by a court or other governmental body; (b) otherwise required by law; or (c) necessary to establish the rights of either party under this Agreement, shall not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that the receiving party shall provide prompt prior written notice thereof to the disclosing party to enable the disclosing party to seek a protective order or otherwise prevent such disclosure.

4.3     <u>Ownership and Return of Company Property</u>.  All materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, all other tangible media of expression), equipment, documents, data, and other property furnished to Agency by Company, whether delivered to Agency by Company or made by Agency in the performance of services under this Agreement but excluding Out-of-Scope Innovations (collectively, the "Company Property") are the sole and exclusive property of Company or Company's suppliers or customers, and Agency hereby does and will assign to Company all rights, title and interest Agency may have or acquire in the Company Property.  Agency agrees to keep all Company Property at Agency's premises unless otherwise permitted in writing by Company.  At the end of this Agreement, or at Company's request, and no later than five (5) days after the end of this Agreement or Company's request, Agency shall destroy or deliver to

Company, at Company's option: (a) all Company Property; (b) all tangible media of expression in Agency's possession or control which incorporate or in which are fixed any Confidential Information; and (c) written certification of Agency's compliance with Agency's obligations under this subparagraph.

       4.4    Observance of Company Rules. At all times while on Company's premises, Agency will observe Company's rules and regulations with respect to conduct, health and safety and protection of persons and property.

    5.    No Conflict of Interest. During the term of this Agreement, Agency will not accept work, enter into a contract, or accept an obligation, inconsistent or incompatible with Agency's obligations, or the scope of services rendered for Company, under this Agreement. Agency warrants that, to the best of Agency's knowledge, there is no other contract or duty on the part of Agency that conflicts with or is inconsistent with this Agreement. This paragraph 5 does not prevent Agency from performing the same or similar services for clients other than Company so long as such services do not directly conflict with Agency's obligations under this Agreement.

    6.    Term and Termination.

       6.1    Term. This Agreement is effective as of the Effective Date set forth above and will continue until terminated in accordance with subparagraphs 6.2 or 6.3 below.

       6.2    Termination by Agency. Agency may terminate this Agreement at any time, with termination effective thirty (30) days after delivery to Company of written notice of termination. Any fees paid above the prorated cost associated with the completed work will be refunded through the last day, including the completion of sprints in progress. Any sprints that are in progress will be completed prior to the engagement ending.

       6.3    Duties Upon Termination. Upon termination of this Agreement for any reason, Agency will cease all work on behalf of Company and promptly deliver the results existing as of the termination date to Company. Company shall promptly pay Agency all fees and approved expenses incurred by Agency to the date of termination within thirty (30) days after receiving Agency's final invoice.

    7.    Defend Trade Secrets Act. Pursuant to the Defend Trade Secrets Act of 2016, if Agency is an individual, Agency acknowledges that he/she shall not have criminal or civil liability under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, if Agency files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Agency may disclose the trade secret to Agency's attorney and may use the trade secret information in the court proceeding, if Agency (X) files any document

containing the trade secret under seal and (Y) does not disclose the trade secret, except pursuant to court order.

8.  Noninterference With Business.  During this Agreement, and for a period of one (1) year immediately following this Agreement's termination or expiration, Agency agrees not to interfere with the business of Company in any manner.  By way of example and not limitation, Agency agrees not to:  (1) solicit or induce any employee, Agency or independent contractor to terminate or breach an employment, contractual or other relationship with Company; or (2) interfere with, impair, disrupt or damage their relationship with any of its current or prospective customers by soliciting or encouraging others to solicit any of them for the purpose of diverting or taking away business from Company.

9.  General Provisions.

9.1  Successors and Assigns.  The rights and obligations of Company under this Agreement shall insure to the benefit of and shall be binding upon the successors and assigns of Company.  Agency may not assign its rights, subcontract or otherwise delegate its obligations under this Agreement without Company's prior written consent.

9.2  Agency Indemnification.  Agency shall be liable for, and agrees to pay, any and all debts, claims, demands, liabilities, expenses, losses, injuries, damages and reasonable attorneys' fees arising out of Agency's services rendered hereunder.  Further, Agency shall indemnify and hold Company harmless from and against any and all debts, claims, demands, liabilities, expenses, losses, injuries, damages for injury to or death of persons, including, but not limited to, Agency's employees, if any, and customers and employees of Company, and damages or destruction to property, including, but not limited to, property of Company, resulting, in any manner, from Agency's performance of services hereunder.  Notwithstanding the foregoing, Agency's cumulative liability under this Agreement shall not exceed the total of the fees paid by Company to Agency under this Agreement.

9.3  Survival.  The definitions contained in this Agreement and the rights and obligations contained in Paragraphs 4 ("Intellectual Property Rights"), 7 ("Noninterference with Business") and 8 ("General Provisions") will survive any termination or expiration of this Agreement.

9.4  Notices.  Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by telecopy or facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice shall be sent to the addresses set forth above or to such other address as either party may specify in writing.

9.5  Governing Law.  This Agreement shall be governed in all respects by the laws of the United States of America and by the laws of the State of Indiana, as such laws are

applied to agreements entered into and to be performed entirely within Indiana between Indiana residents. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Marion County, Indiana, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in Marion County, Indiana, such personal jurisdiction shall be nonexclusive.

9.6     Severability.  If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same economic effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

9.7     Waiver; Amendment; Modification.  No term or provision hereof will be considered waived by either party, and no breach excused by either party, unless such waiver or consent is in writing signed by the waiving party.  The waiver of, or consent to, a breach of any provision of this Agreement shall not operate or be construed as a waiver of, consent to, or excuse of any other or subsequent breach.  This Agreement may be amended or modified only by mutual agreement of authorized representatives of the parties in writing.

9.8     Entire Agreement.  This Agreement constitutes the entire agreement as detailed in Exhibit A or future Exhibits between the parties relating to this subject matter and supersedes all prior or contemporaneous oral or written agreements concerning such subject matter.  The terms of this Agreement will govern all services undertaken by Agency for Company.

IN WITNESS WHEREOF, the parties have executed this Agreement on the below dates.

**DETEGO HEALTH LLC**                          **THE ENGINEERED INNOVATION GROUP, LLC**

Signature: *Alan Wilson* (DocuSigned by: 88C6144A2314450...)

Signature: *Jake Miller* (DocuSigned by: 183CEBACB1974F8...)

Name: Alan W. Wilson                             Name:  Jake Miller

Title:   President, COO & GC                     Title:  Chief Executive Officer

DocuSign Envelope ID: B3D8AF38-6C9C-489F-8D57-042C2C9EB4E6

Date: 1/28/2024

Date: 1/28/2024

## DECLARATION OF RICHARD HALDEMAN

Pursuant to 28 U.S.C. § 1746, I, Richard Haldeman, under penalty of perjury declare as follows:

1. I am over the age of 18 and a U.S. citizen. I make this Declaration supporting Plaintiffs' Complaint at Law and Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction to prevent further imminent and irreparable harm to Plaintiffs resulting from Defendants' unlawful and unauthorized actions.

2. I am the Chief Executive Officer of Detego Health, LLC ("Detego").

3. Detego is a Texas limited liability company specializing in providing healthcare plans for small businesses.

4. Detego is a third-party administrator and level-funded plan sponsor for its Detego Health plan. It is focused on small business health benefits, helping small businesses and their employees save on healthcare expenses.

5. As a third-party administrator, Detego Health offers a range of services including claims and benefits plan administration, benefit design and management, analytics, and performance analysis.

6. On January 28, 2024, Detego entered into a Master Services Agreement ("Agreement") with Engineering Innovation Group ("EIG") to govern the provision of services by EIG to Detego.

7. Attached to this Declaration is a true and correct copy of the Agreement between Detego and EIG. (Exhibit "A").

8. The Agreement was executed with the intent of fostering a collaborative relationship between Detego and EIG, with EIG providing specialized services to support Detego's business operations.

9. Under the Agreement, EIG was retained to perform specific services as outlined in one or more Statements of Work (SOWs). These services included, but were not limited to, the development of innovations, processes, and intellectual property for the benefit of Detego.

10. The Agreement explicitly established that all intellectual property developed by EIG within the scope of its work for Detego would be the sole and exclusive property of the Detego. This included any innovations, processes, or other proprietary developments created during the course of the engagement.

11. Notably, EIG agreed that it "does and will assign to [Detego], or [Detego's] designee, [EIG's] entire worldwide right, title and interest in and to all [Detego] Innovations and all associated records and intellectual property rights."

12. Further, per Section 5, EIG agreed that it "will not accept work, enter into a contract, or accept an obligation, inconsistent or incompatible with Agency's [EIG's] obligations, or the scope of services rendered for Company [Detego], under this Agreement. Agency [EIG] warrants that, to the best of Agency's [EIG's] knowledge, there is no other contract or duty on the part of Agency [EIG] that conflicts with or is inconsistent with this Agreement. This paragraph 5 does not prevent Agency [EIG] from performing the same or similar services for clients other than Company [Detego] so long as such services do not directly conflict with Agency's [EIG's] obligations under this Agreement."

13. The Agreement also contained robust confidentiality provisions. Section 4.2 of the Agreement defined "Confidential Information" broadly to include technical and non-technical

information, trade secrets, intellectual property, and other proprietary information related to the Detego's business. EIG was obligated to maintain the confidentiality of such information and to use it solely for the purpose of performing services for Detego.

14. Additionally, the Agreement included a "No Conflict of Interest" clause in Section 5, which prohibited EIG from engaging in any work or obligations that would conflict with its duties under the Agreement. This provision was designed to ensure that EIG's actions would not undermine Detego's business interests.

15. The Agreement further contained a "Noninterference with Business" clause in Section 8, which prohibited EIG from interfering with Detego's business operations during the term of the Agreement and for one year following its termination. This provision was intended to protect the Detego's relationships with its employees, contractors, and customers.

16. In reliance on the Agreement, Detego provided EIG with access to its confidential information, intellectual property, and other proprietary materials necessary for the performance of services. EIG also developed proprietary innovations and processes for Detego during the course of the engagement.

17. Subsequently, on March 16, 2025, the parties executed a SOW titled "Detego Health Salesforce Replatform & Roxie AI Implementation" ("SOW"), wherein EIG agreed to upgrade Detego's Salesforce infrastructure by incorporating EIG's Roxie AI automation technology. This upgrade aimed to accelerate claims processing, reduce call center wait times, and improve the auto-adjudication of claims (the "Project").

18. Attached hereto is a true and correct copy of the March 16, 2025 SOW. (Exhibit "B")

19. The SOW established a Team Allocation and Hourly Billing Structure that designated specific project leaders and included a six-month phased budget and billing plan.

20. Following execution of the SOW, EIG CEO Jake Miller disclosed to Detego that EIG was experiencing significant financial difficulties, including the inability to meet payroll obligations necessary to adequately pay staff and deploy the Roxie AI solution.

21. In response to Miller's disclosure, Detego and EIG reached a separate agreement under which Detego agreed to cover EIG's payroll expenses for the duration of the SOW.

22. In return for Detego's assumption of these financial obligations, Jake Miller agreed that EIG would separate Roxie AI from EIG so that it would become part of a new company that would be subsumed into Detego's business operations.

23. In accordance with this agreement, Detego paid EIG $170,000.00 so that it could meet its payroll obligations.

24. Subsequent to the agreements entered into by the parties described above, on or about June 16, 2025, Alan Wilson, the President and Chief Legal Officer of Detego Health, LLC, and I had a conversation with Jake Miller, wherein we were advised that EIG agreed to terms to sell EIG to TrueTech, an India-based company.

25. On June 26, 2025, Detego received correspondence from Bose, McKinney & Evans, LLP, attorneys for EIG. The letter advised that "due to recent and significant financial challenges, EIG has determined that it is necessary to cease its business operations, effective as of Monday, June 30, 2025." (See Correspondence dated June 26, 2025, attached hereto as Exhibit "C").

26. The letter further stated that "EIG recommends that Detego consider engaging TrueTech Solutions ("TrueTech"), under the leadership of Naren Vijayakumar, to assist with

transition support and the maintenance of existing platforms. EIG is willing to facilitate an introduction, and TrueTech has conveyed a willingness to begin onboarding promptly."

27. As such, on June 26, 2025 I became aware that EIG is ceasing its business operations, effective as of June 30, 2025 and as a result, EIG will be unable to continue performing its contractual obligations to Detego beyond that date.

28. On June 26, 2025 I also learned that after June 30, 2025, EIG will not share with Detego any proprietary code associated with the Roxie AI platform, despite its inclusion of Detego's confidential information, intellectual property, and other proprietary materials, and contrary to Detego's agreement with EIG and Jake Miller.

29. Based on the June 16, 2025 conversation, and June 26, 2025 correspondence, and upon information and belief, while EIG has agreed to sell its business operations to TrueTech, Jake Miller and Eric Tobias are separating Roxie AI from EIG and forming a new company that is funded by Eric Tobias but will not be subsumed into Detego's business operations.

30. This sale and separation of Roxie AI raise significant concerns regarding the potential exposure of Detego's confidential information and intellectual property to unauthorized third parties. Such exposure would constitute a breach of the confidentiality provisions of the Agreement and would result in irreparable harm to Detego.

31. The separation of Roxie AI into a new company formed by Jake Miller and Eric Tobias but not subsumed into Detego's business operations is contrary to the agreement reached when Detego agreed to meet EIG's payroll obligations.

32. The proposed sale also threatens to disrupt the ongoing services being provided by EIG to Detego, which are critical to Detego's business operations.

33. This disruption would violate the terms of the Agreement, including the "No Conflict of Interest" and "Noninterference with Business" provisions.

34. As of this date, EIG has failed to deliver and/or develop, among others, the following deliverables promised under the Agreement: AI-Driven Claims Adjudication & Process Automation; deployment of Roxie AI to automate claims adjudication, document indexing, and duplicate claim detection; implementation of intelligent queue prioritization based on complexity, urgency, and claim type; integration of policy-driven decision0making for auto-adjudication rules and real-time claim status tracking; automated prior authorization workflows to reduce processing delays and manual effort; customer service automation via Roxy AI for real-time status inquiries, claim tracking, and provider communications; multi-channel support (chat, email, SMS, mobile push notifications) for members and providers; deployment of a self-service portal and mobile application features to allow members to check claim status, submit documents, and receive automated updates; implementation of a secure provider web form for document submissions and case tracking; Development of a real-time COB verification system leveraging member input and external eligibility data sources; Optional integration with third-party verification services (e.g., Experian Health) for automated coverage discovery; design and implement intelligent work distribution and queue management to balance workloads dynamically; role-based workload prioritization and assignment models for adjudicators, customer service agents, and claims processors; and automated real-time reporting and dashboards to track claim processing efficiency, customer service performance, and error reduction.

35. Detego has made good faith efforts to address these concerns with EIG, Jake Miller, and Eric Tobias, but has been unable to obtain adequate assurances that its confidential information and intellectual property will be protected or that the ongoing services will not be disrupted. As a

result, Detego has been forced to seek judicial intervention to prevent not only the sale and transfer of EIG's business and to protect its rights under the Agreement, but also the separation of Roxie AI from EIG.

36. Detego will suffer imminent and irreparable harm without the restraining order against EIG, Jake Miller, and Eric Tobias, including loss of business relationships, damage to reputation, and dilution of intellectual property value, which cannot be compensated by monetary damages alone.

37. The Roxie AI platform's unique capabilities cannot be replicated or replaced by other available technologies. Its loss will adversely affect Detego's claims processing, call center wait times, and adjudication of claims resulting in damages that cannot be quantified.

38. In accordance with 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

**FURTHER AFFIANT SAYETH NAUGHT…**

Executed on the 1st day of July, 2025.

> */s/ Richard Haldeman*
> Richard Haldeman